Duruee, Judge,
delivered the opinion of the court:
From 1944 through 1949 plaintiffs Gilpin and Scott and a third party, Donald McFadon, made 24 purchases of timberlands in the State of Oregon, involving 25 tracts of timber at a total cost of $146,362.45. No purchases were made after 1949. From 1944 through 1952, in 14 transactions, the parties sold these 25 tracts for a total of $803,255.00. It is only the last two sales in 1952 that are involved in this case. These two 1952 sales included 11 tracts sold for a total price of $454,720.00, with a total gain of $407,851.97. Plaintiffs Gilpin and Scott reported their distributive shares of this gain as long-term capital gain for income tax purposes, and paid their taxes on this basis. The Commissioner of Internal Bevenue decided that the gain was ordinary income to plaintiffs, and required them to pay deficiencies accordingly, for refund of which they bring this suit.
The initial question is whether the tracts of timberland sold by the parties in 1952 were “capital assets” as defined by statute.
The Internal Revenue Code of 1939, 26 U.S.C. (1952 ed.) Sec. 117, provides:
*436 Sec. 117. capital gaiNS AND losses.
(a) Definitions. — As used in this chapter—
(1) Capital assets. — The term “capital assets” means property held by the taxpayer (whether or not connected with his trade or business), but does not include—
(A) * * * property held by the taxpayer primarily for sale to customers in the ordinary course of his trade or business; * * *
The gain was reported in 1953 and 1954. There was no change in the above definition in the 1954 Code, § 1221.
Obviously plaintiffs acquired this property for sale but we do not think they acquired or held property “primarily for sale to customers in the ordinary course of his trade or business,” as stated in the statute. Among the factors considered in reaching this conclusion are the criteria considered by this court in MeConkey v. United States, 131 Ct. Cl. 690 (1955). In deciding that residential lots were not sold in the ordinary course of the trade or business of plaintiffs in that case, the court held that they were entitled to treat these transactions as the sale of capital assets and the profit as capital gain. The court said (at page 692) :
No one factor, obviously, is determinative of whether or not property is held primarily for sale to customers in the ordinary course of one’s trade or business. But, among the factors regarded by the courts as important are the activities of the taxpayer, or his agents, in promoting sales, the extent of the development and improvement of the property, the purpose for which the property was acquired, and the frequency and continuity of sales. * * *
Prior to the agreement in 1944, plaintiffs and McFadon had never been associated in business together. Scott’s primary occupation was the practice of law; Gilpin was president of a furniture factory. Both spent a minor part of their time on personal investments in stocks, and a still smaller part of their time on the timberland transactions involved in their agreement with McFadon, who was the manager of the enterprise. He had authority under the agreement to buy, manage and sell timberlands in his own name for the joint enterprise. The parties were to share equally in profits, after paying management expenses and ten percent of the net profits to McFadon as compensation.
*437 The parties never engaged in any activity in promoting sales of their timberlands, except for an unsuccessful effort to advertise and sell three of the 25 tracts at public auction in 1947. There was never any other advertising of lands purchased under the agreement. McFadon spent a small percentage of his time in the purchase, management and sale of the timberlands. No timber was ever sold on a stumpage basis. The negotiations for the purchase in 1952 of the tracts involved in this case were initiated by the two buyers, Bullock and the Multnomah Plywood Corporation, without any sales activity by plaintiffs or McFadon. McFadon’s activities under the agreement were those of a trustee managing an investment rather than buying and selling timberland in the ordinary course of business of plaintiffs.
No effort was made to develop or improve the property.
No roads were built to or on these timberlands, and no logging operations were ever conducted thereon by the parties to the agreement.
The lands were purchased by the parties through a broker, for the purpose of an investment. Timberlands of this type had been held by their purchasers for ten to twenty years or longer. The price of timber rose so rapidly after the war from 1946 until 1952 that it was possible to sell the timber-lands at substantial profit after much shorter holding periods than was anticipated when the tracts were purchased.
The tracts sold by plaintiffs to Bullock in 1952 were held by plaintiffs for a period of three years and four months between purchase and sale.
In the sale to Multnomah in 1952, the holding period averaged four years and two months, the shortest period being three years and five months. The average holding period for all the tracts purchased between 1944 and 1949 and sold between 1946 and 1952 was 34 months. Timber-lands of the type purchased under the agreement between plaintiffs and McFadon were held by their owners for ten to twenty years or longer. However, the rapid rise in the price of timber after World War II made it possible to make profitable disposition of timberlands after shorter holding periods than had been anticipated when the earlier purchases had been made under the agreement. The profit realized *438 from tliese sales by plaintiffs was not due to any business activity by plaintiffs; it resulted from this rapid rise in the price of timber which had been purchased as a capital asset investment, and not “primarily for sale to customers in the ordinary course of (their) trade or business” as defined in the Internal Bevenue Code of 1939, § 117.
The absence of any activity by plaintiffs in promoting sales of these timberlands, with one minor and unsuccessful exception; the complete lack of any evidence that plaintiffs had ever tried to develop and improve their timberlands between 1944 and 1952; the infrequent transactions involving an average of less than two sales a year over an eight-year period; and the evidence as to the purpose of the parties in acquiring these timberlands as investments; are factors that considered together, lead us to the same conclusion that this court reached in McConkey v. United States, supra.
We therefore conclude that the sales of the timber tracts to Bullock and Multnomah in 1952 by plaintiffs under the terms of their agreement with McFadon constituted sales of capital assets as defined in Sec. 117 and that the profits realized by plaintiffs were capital gains and not ordinary income.
Judgment will be entered for plaintiffs with the amount of recovery to be determined pursuant to Buie 38(c).
It is so ordered.
Davis, Judge; Laramoee, Judge; Whitaker, Judge; and JoNes, Chief Judge, concur.
FINDINGS OF FACT
The court, having considered the evidence, the report of Trial Commissioner Saul Bichard Gamer, and the briefs and argument of counsel, makes findings of fact as follows:
1. Plaintiffs Byron D. Scott (hereinafter sometimes referred to as “Scott”) and Virginia P. Scott are husband and wife, residing in Tacoma, Washington. For the calendar years 1953 and 1954, they filed joint Federal income tax returns. Scott has practiced law continuously since 1926 and at all times here relevant was a partner in the law firm of Scott, Langhorne & McCavick, with offices located in the Perkins Building in Tacoma.
*439 2. Plaintiffs Joseph H. Gilpin (hereinafter sometimes referred to as “Gilpin”) and Maryon T. Gilpin are husband and wife, residing in Tacoma, Washington. For the calendar year 1954, they filed a joint Federal income tax return. Gilpin at all times here relevant was president and principal stockholder of Northwest ’Chair Company, a corporation located in Tacoma and engaged in the manufacture of furniture. As of the time of the trial herein in 1960, he had been so engaged for approximately 35 years. There was no connection between Gilpin’s occupation as a furniture manufacturer and his activities relating to timberlands, as hereinafter described.
3. The only issue presented herein is whether the gain realized by the plaintiffs during the taxable years involved (1953 and 1954 for the Scotts and 1954 only for the Gil-pins) from two sales of timberlands in southern Oregon in 1952 constitutes ordinary income or long term capital gain. By order of the court, the trials of the two cases involved herein were consolidated.
A. For many years prior to 1942, one Donald McFadon of Tacoma, Washington, had been actively engaged in the logging business in the Puget Sound area. While so engaged, he bought small tracts of timberland, cut the timber with Ms own equipment, and sold the logs to mills. In this connection, he was familiar with the cost of cutting the timber and transporting it to the mills, which factors are used in determining the value of timber as it stands on a particular tract. In 1940 he became ill. Prior thereto in the conduct of his business he always went into the woods himself, but thereafter was unable to do so. As a result, in August 1942, he retired from the logging business and sold Ms machinery and equipment, and certain standing timber. Thereafter, he considered possibilities for the investment of his moneys. He had some of Ms funds invested in stocks and bonds but desired more diversification. In the fall of 1942, he first investigated a magnesium mining tract in Utah but decided against its purchase because of his lack of familiarity with such property. He thereupon decided to adhere to timber, a field with which he was familiar. In 1943, he commenced purchasing tracts of timber in Douglas County in southern *440 Oregon with the intent of selling the timber alone, or the land and timber, depending upon the circumstances and conditions as they might prevail in the future.
5. In furtherance of his activities commencing in 1943 relating to tracts of timber as set forth in finding 4, McFadon from 1943 through 1955 bought and sold southern Oregon timberland for his own account.
The purchases were made from 1943 to 1952, inclusive. They consisted of 59 tracts, the cost of which totaled approximately $232,000. From 1945 to 1955, inclusive, he made 37 sales of timberland consisting of 58 tracts for $1,582,038.50.
From 1945 to 1952, inclusive, McFadon made 30 sales consisting of 37 of these tracts at sales prices totaling $679,-848.50. The following are data concerning the tracts purchased in the years 1943 to 1945, inclusive, and sold in 1945 and 1946:
Date of purchase Cost Date of sale Sales price
1943. $4,500.00 5/29/45 $13,620.00
1944. 4,550.00 4/22/46 18,362.50
9,580.70 6/1 /46 41,655.00
During said 1945-1952 period some of the tracts were sold in less than a year after purchase, as follows:
Date of purchase Cost Date of sale Sales price
9/11/47— $1,000.00 11/17/47 $6,000.00
11/3/47— 1,673.00 12/30/47 9,527.00
11/14/47.. 5,000.00 12/30/47 9,600.00
8/15/46— 2,650.00 4/30/47 11,000.00
11/9/46... 600.00 7/24/47 3,000.00
6/2/47.... 3,100.00 12/29/47 9,825.00
10/1/47— 6,100.00 6/ 1/48 24,375.00
6/23/48— 2,500.00 12/30/48 7,500.00
8/18/48— 2,100.00 12/22/48 7,500.00
9/1/48.— 1,811.40 4/28/49 6,500.00
6/17/49— 4,226.25 12/27/49 14,500.00
10/1/49— 2,081.74 5/ 8/50 9,500.00
2/3/50.... 4,346.00 9/15/50 25,980.00
In the other instances, the holding periods varied, extending to approximately 514 years.
From 1953 to 1954, inclusive, he made 5 sales consisting of 12 tracts at sales prices totaling $387,155. These tracts had been purchased in 1947, 1948, 1950, and 1951.
*441 In 1955, be made 2 sales consisting of 9 tracts at sales prices totaling $515,035. These tracts had been purchased in 1950,1951, and 1952.
6. From 1946 to 1954, inclusive, McFadon made 740 purchases of securities at a cost of $2,931,694 and 83 purchases of commodities at a cost of $1,149,470.50.
During the same period, he made 636 sales of securities for $2,552,571.399 and 94 sales of commodities for $1,184,381.25.
7. During the summer of 1944, McFadon, Gilpin and Scott orally agreed to associate together in the purchase and sale of timberlands, which transactions would be separate and distinct from those which McFadon would make for his own account, as set forth in finding 5. As shown by such finding 5, at that time McFadon had not as yet made any sales of any timberlands he had purchased for his own account. Prior thereto Scott, Gilpin and McFadon had been friends and had known each other socially for many years, but had had no business associations with each other.
On April 18, 1946, the oral agreement was reduced to writing. As also shown by said finding 5, at that time McFadon had, on May 29,1945, made one sale of timberland purchased in 1943 for his own account. Said written agreement provided as follows:
THIS AGREEMENT AND DECLARATION OE TRUST, made and entered into by donald mceadon, j. n. gilpin and byron d. scott, all of Tacoma, Washington.
WITNESSETH:
That whereas the parties hereto have heretofore purchased various tracts of land in the State of Oregon, the title to which has been taken in the name of Donald McFadon, Trustee, and the parties heretofore contributed equally to the purchase price of the same;
And whereas it is the intention of the parties hereto to purchase additional lands in the State of Oregon and elsewhere, and from time to time to sell the same, or portions thereof, and the parties have agreed to make equal contributions for said purpose, and for all expenses in connection with the same and with the holding and sale of said properties:
now, therefore, it is hereby agreed by and between the parties hereto that Donald McFadon is hereby nominated and constituted the Trustee for said parties for *442 tbe purpose aforesaid, and for any and all purposes connected with the lands heretofore purchased or to be in the future purchased by said parties.
It is further UNDERSTOOD AND AGREED by and between the parties hereto that neither party may sell or dispose of his interest in the properties thus held by Donald Mc-Fadon, Trustee, without first offering his interest in the equal shares to the other parties hereto at the same price for which he may have received a firm and bona fide offer, and either or both of the other parties to this agreement shall have the right in that event to buy said interest at the price so offered the party desiring to sell.
It is further understood and agreed by and between the parties hereto that any or all of the properties now owned or hereafter acquired may be sold by the said Trustee upon the agreement of any two of the parties hereto; but it is distinctly understood and agreed that a deed to any of the said properties from Donald Mc-Fadon, Trustee, shall convey good title to the purchaser, and the purchaser shall not be required to look to the application of the purchase money, and shall not be required to ascertain whether or not a majority of the parties hereto have agreed to such a sale, but such deed from the Trustee shall convey the full title to said premises, and in case the said Trustee shall make any sale without the approval of at least one of his associates herein, then the remedy of his associates shall be against him personally and shall in no way affect the title to the lands so conveyed by him.
It is FURTHER UNDERSTOOD AND AGREED that Said Trustee shall supervise all of said properties, for which he shall be entitled to his actual expenses and outlays, and as compensation for his services he shall receive upon the sale of any of said properties 10% of the share of each of the parties hereto in the net profits of any such sale.
It is FURTHER UNDERSTOOD AND AGREED that in CaS© the said Donald McFadon should die or become incapacitated to supervise said properties, then and in that event as to any properties sold after such occurrence he, or Ms estate, shall be entitled to receive but 5% of the net profits. The term “net profits” as used herein, is intended to mean the purchase price less all expenses for acquiring and supervising said timber, and all taxes incidental thereto. For the purpose of determining the expenses of acquisition and supervision, the total purchase cruise for all parcels shall be prorated against the cruise for parcels sold separately.
*443 It is FURTHER UNDERSTOOD AND AGREED that ill Case of the death or resignation of the said Donald McFadon, Trustee, or in case he should become incapacitated from so acting, then Byron D. Scott and J. H. Gilpin are hereby designated as the successor Trustee in the order named.
in witness whereof the parties have hereunto set their hands, in triplicate, this 18th day of April 1946.
/S/ Donald McFadon.
/S/ J. H. Gilpin.
/S/ Byron D. Scott.
8. (a) During the years 1944 through 1952, the purchases and sales of timberlands which were made pursuant to and in accordance with the McFadon-Scott-Gilpin agreement referred to in finding 7 (hereinafter referred to as the “Agreement”) are summarized by the following chart:
Year Number of purchases Number of tracts pm-chased Cost Number of sales Number of tracts sold Sales price
1944— $22,000.00
1945— 10,975.00
1946_ 30,828.85 $105,685.00
1947_ 25,680.00
1048— 48,365.00
1949 — 8,513.60
1950-
1951-
1952-
Total.. 24 25 146,362.45 14 25 803,255.00
These timberlands were all located in Douglas County, Oregon, and vicinity.
(b) The following chart sets forth the details of each transaction referred to in paragraph (a) above, including the holding period of each tract purchased and sold:

*444

*445 ¡9. (a) As shown by finding 8 (b), the last purchase made under the Agreement was consummated on January 20,1949. As shown by findings 8 (a) and 8 (b), after that date the only sales made thereunder were one in each of the years 1949, 1950 and 1951 and two in 1952. The two sales in 1952 consisted of 11 tracts, with the total gross sales prices being $454,720. By these two sales the remaining timberlands purchased under the Agreement were disposed of.
(b) One of the 1952 sales was made on January 10, 1952, to George and Violet Bullock and consisted of one tract purchased on September 15, 1948. Negotiations leading to this sale were initiated by a letter written by Dale Bullock, brother of George Bullock, to McFadon on May 8, 1951, stating that he and his brother had “been looking for a piece of timber to log and came across a piece owned by you * * * and would like very much to make a deal with you for this.” Prior to the receipt of this letter McFadon had never heard of the Bullocks. The contract of sale to the Bullocks effecting a sale of the tract for $45,000 provided for an initial payment of $10,000 and for payment of the balance of $35,000 over a 2-year period in two payments of $17,500 each, the deferred payments bearing interest at 5.5 percent per annum. It further provided that the purchasers could cut timber on the land involved provided that payment for the logs would be made to the seller at a specified rate, such payments to apply on the total purchase price. Title was to be conveyed on payment of the entire purchase price.
(c) The other 1952 sale was made on June 27,1952, to the Multnomah Plywood Corporation. It consisted of the 10 tracts set forth in finding 8(b), the first having been acquired on November 24, 1947, and the last on January 20, 1949. Negotiations leading to this sale were initiated by a representative of Multnomah coming to McFadon’s office. Thereafter, following a long-distance telephone conversation with a Multnomah representative, McFadon, on May 29, 1952, wrote the following letter to Multnomah:
Pursuant to my conversation with your Mr. Johnson this morning on long distance, I inclose herewith a copy of a list of my holdings, personally, and one of my holdings as Trustee, both in the West Fork-Middle Creek districts.
*446 As stated by me this morning to Mr. Johnson, these two lists of timber are so intermingled that it would seem the logical thing, 'both from the point of view of the purchaser and from that of the seller, to sell them together.
You will note that I have arranged these lists to show the amounts of sugar and yellow pine separately from the rest.
As arranged with Mr. Johnson, I will call at your office about 8:30 Tuesday morning next, June 3, on my way to Boseburg.
Enclosed with the letter was a list of Ms personal timber holdings and his holdings as Trustee under the Agreement, the various tracts being intermingled on the list. The contract of sale to Multnomah, effecting a sale of the 10 tracts for $409,720, provided for an initial payment of $61,000 and for payment of the balance of $348,720 over a 3-year period in four payments of $60,000 on December 26, 1952, $96,240 on June 20,1953, $96,240 on June 20,1954, and $96,240 on June 20, 1955, respectively, the deferred payments bearing interest at 5.5 percent per annum. It further provided that the purchaser could cut timber on the land involved provided that payment for the logs would be made to the seller at a specified rate, such payments to apply on the total purchase price. Title was to be conveyed on payment of the entire purchase price.
10. There was never acquired under the Agreement any such lesser interests in timberlands such as cutting rights. In all instances the land and timber were purchased outright. The parties to the Agreement never logged any of the timber on the timberlands held under the Agreement, never owned, leased or contracted for the use of any logging equipment with respect to such lands, never manufactured any lumber from the timber on such lands, and never owned or controlled a sawmill in connection with such lands. The timber-lands purchased under the Agreement were, at the time of purchase, more in inaccessible areas than accessible, insofar as roads were concerned. The parties to the Agreement never constructed any roads to or on the timberlands held under the Agreement.
*447 11. McFadon’s purpose in entering into the Agreement was the same as in purchasing timberlands for his own account, i.e., as an investment, as set forth in finding 4. On September 20, 1944, and December 21, 1944, when the first two purchases were made under the Agreement (finding 8 (b)), McFadon had not as yet sold any timberlands he had purchased for his own account (finding 5). At these times it was not known how long the timberlands which McFadon was purchasing for his own account or under the Agreement would be held. It was known that timberlands of the type McFadon was purchasing had been held by their owners for as long as 10 or 20 years or longer. However, the first sale of McFadon’s own lands, purchased in 1943, was made on May 29,1945, and by June 1,1946, he had sold, at a profit, all of the lands he had purchased for his own account in 1943 and 1944, as well as some lands purchased in 1945 (finding 5). The first sale of lands under the Agreement was made on June 1, 1946, at a sales price of $16,230, the lands having been purchased on November 1, 1945, for $6,875 (finding 8 (b)). It thus became clear by that time that profitable sales could be made after shorter holding periods than first anticipated. Of the 24 purchases made under the Agreement (finding 8 (a)), 22 were made after May 29,1945, when McFadon made the first sale of his own lands, and 18 were made after June 1, 1946 (finding 8(b)), including the 11 tracts sold in 1952, referred to in findings 9 (b) and 9 (c). By the end of 1946, all lands purchased in 1944 and 1945 under the Agreement had been sold (finding 8(b) ). After the war, conditions changed so fast, the prices of timber rose so rapidly, and there was such a good market for timber, it was possible to make profitable dispositions of timberlands after much shorter holding periods than was anticipated when the first purchases were made both on McFadon’s own account and under the Agreement.
12. During the years 1944 through 1955, the parties to the Agreement made cash contributions and withdrawals as follows:
*448 Scott Gilpin McFadon
Year
Contr. Withdr. Contr. Withdr. Contr. Withdr.
1944 $262.97 $262.96
1945 4,700.00
1946
1947 12,750.00
1948 25,066.40
1949
1950
1951 275.00 275.00 275.00
1952
1953
1954
1955 28,855.24
Total. 30,925.00 238,051.61 30,925.00 238,051.60 30,925.00 302,321.85
13. (a) Eight of the 25 tracts sold under the Agreement were sold to five purchasers who also bought tracts belonging to McFadon.
(b) Of the 14 sales made under the Agreement (finding 8 (a)) only two were made to the same buyer.
14. (a) During the 1944 — 1955 period when the Agreement was in effect, McFadon maintained a small office in an office building in Tacoma. This office was shared with another person who was in the insurance business and who paid one-half of the expense of the office. McFadon’s share of the office rent averaged approximately $25 a month.
(b) For the years 1946-1955, inclusive, McFadon was listed in the Tacoma telephone directories with such office address (as well as his residence address) and with his name followed by the word “timber.” McFadon was also listed in the classified section of the Tacoma telephone directories for 1946-1952, inclusive, under “Timberland Companies” and for 1953-1955, inclusive, under “Timber and Timberland Companies.”
(c) The timberlands purchased under the Agreement were located in southern Oregon at an average distance of from. 350 to 400 miles from Tacoma, Washington, where McFadon, Scott and Gilpin all resided. No sales office was ever maintained in southern Oregon with respect to any lands purchased under the Agreement, nor were any such lands ever listed with a real estate broker for sale. No such lands were ever sold to anyone living or having an office in Tacoma or to anyone in the State of Washington.
*449 15. In 1947, at McFadon’s suggestion, tibe parties to tlie Agreement derided to attempt to auction some timberland purchased pursuant to the Agreement, hoping thereby to obtain higher sales prices. Advertisements were placed in the classified advertising section of the October and November issues of a publication called “The Timberman,” and in 20 issues of the Roseburg News-Review, a newspaper, during the period September 23,1947 to October 21, 1947. The advertisements, headed “Timber for Sale”, announced that an auction sale would be held at Roseburg, Oregon, on November 19, 1947, “for the sale of approximately 26 million feet of high grade timber within 30 miles of Roseburg”, and that a prospectus could be obtained from the firm of Orcutt & Long in Roseburg or from the “owner”, McFadon, at his office in Tacoma. The prospectus, also headed “Timber for Sale”, listed the tracts offered and set forth other information, including the terms available. With respect to such terms, it stated that a deposit of 10 percent would be required with the bid, and that an additional 19 percent of the purchase price would be required when the contract of sale was consummated, the 71 percent balance of the purchase price to be paid over a 2-year period. Alternatively, it was provided that the purchaser could pay the entire 90 percent balance in cash.
The prospectus listed five tracts, three being tracts purchased under the Agreement, and the other two consisting of timberlands owned by McFadon individually. McFadon was described in the prospectus as the owner of all of the tracts.
The auction was not a success, no sales resulting therefrom. Only one small logger attended the auction. One sale of timberland purchased under the Agreement and listed in the prospectus was made the same day as the auction, i.e., November 19, 1947, but negotiations leading up to this sale were underway prior to the auction. The sale was not made as a result of the advertising of the auction. Another sale of a tract purchased under the Agreement was made on November 29, 1947, which was 10 days after the auction. This tract was not one of those included in the prospectus and similarly did not result from the advertising.
*450 Other than the advertising of this auction, there was never any other advertising of lands purchased under the Agreement, including the tracts sold in 1952, all of which were acquired after the dates of the 1947 advertising and auction.
16. As shown by finding 8 (b), during the years 1944,1945, and 1946,11 tracts of timberlands were purchased under the Agreement. Eight of these tracts were located in the northern part of Douglas County, Oregon,[1] and one was located in the southern part of the county.[2] Two were not located in the county.[3] During this same period, McFadon purchased for his own account 13 tracts. Eight of these tracts were located in the northern part of Douglas County,[4] and four were located in the southern part.[5] One was not located in the county.[6]
Also as shown by finding 8 (b), during the years 1947,1948, and through January 20, 1949,14 tracts were purchased under the Agreement. Eleven of these tracts were located in the southern part of Douglas County,[7] and three were in the northern part.[8] During this same period, McFadon purchased for his own account 24 tracts. Thirteen of these tracts were located in the northern part of Douglas County,[9] and eight were located in the southern part.[10] Three were not located in the county.[11]
17. (a) Each day that McFadon went to his office in Tacoma he would normally spend approximately 6 hours there. He spent less time on timberlands in general, including both his own and those relating to the Agreement, than on other matters. Only approximately one-third of the time he did spend on such timberlands was devoted to timberlands purchased, held, and sold under the Agreement. At times Mc-Fadon was away from Tacoma and his office for considerable *451 periods. For approximately 2 months every summer he went to his summer home located approximately 30 miles from Tacoma. However, during such time he was available for the handling of matters arising under the Agreement. For instance, as shown by finding 8(b), three .purchases and two sales of such Agreement timberlands were made during the months of July and August. In addition to such absences from his office during the summertime, McFadon took 4 to 8-week trips in the winter to California or Arizona and on one occasion during the existence of the Agreement he spent 4 months in Europe. During McFadon’s absences from his office or Tacoma, no one else handled any inquiries concerning timberlands held under the Agreement. No such inquiries were ever referred to Scott or Gilpin. No stenographer, bookkeeper or other employee was ever employed in connection with any affairs or matters relating to the Agreement.
(b) Timberlands purchased under the Agreement were acquired through a broker in Portland, Oregon. If he was interested in available timberland located by the broker and desired to investigate it, McFadon engaged, a so-called “cruiser” who acted in the capacity of an independent contractor and who supplied his own equipment in making the cruise. For this purpose, one particular cruiser who had performed cruises for McFadon over a number of years was usually engaged. However, if he was not available, other cruisers were used. The cruiser was paid by the day and reported on the quantity, quality and accessibility of the tract involved. McFadon himself was not physically able to go on any such lands. McFadon did not personally negotiate with any of the sellers from whom lands under the Agreement were purchased. If, after the cruise report was studied, a decision was made to purchase the property, the transaction would be handled through the broker. Normally, McFadon communicated with the broker by telephone or letter. However, on those occasions when he traveled through Portland, McFadon usually visited the broker’s office to discuss timberland matters with him.
18. McFadon negotiated the sales prices of lands sold under the Agreement. The transactions pertaining to the clos *452 ing of the sale and the execution of the sales contract would normally take place in the office of a firm of attorneys, Orcutt & Long, located in Eoseburg, Oregon. These attorneys (mentioned in the advertisements referred to in finding 15) were familiar with Oregon law relating to timberland transactions and were employed in connection with sales of Agreement lands. These attorneys did practically all the legal work relating to matters arising under the Agreement.
19. McFadon kept the books relating to Agreement transactions. These books consisted of two small record books, one in the nature of a journal and one in the nature of a ledger. There were also two checkbooks. The journal was a combined cash book and journal book. These books reflected the accounts relating to the Agreement during the period in which it was in effect.
20. As provided in the Agreement, the legal title to all timberlands purchased under the Agreement was in the name of Donald McFadon, Trustee. As compensation for his services as Trustee and for supervising the properties, Mc-Fadon received, upon the sale of such properties, 10 percent of the shares of Gilpin and Scott in the net profits of the sales.
21. No timber on a straight stumpage basis was ever sold under the Agreement. McFadon considered this possibility but concluded against selling in this manner because it would require having employees and a payroll, as well as possible controversies with loggers as to whether certain logs should be included in a day’s work. The Agreement provided that two of the three parties thereto had to agree to a sale. In 1951, Scott suggested making sales on such a stumpage basis because of his belief that such sales would be entitled to capital gains treatment. However, the forms of sales contracts that were finally drafted were at the insistence of McFadon who felt that, in addition to the above-described difficulties of operating in such a manner, the transactions would more likely be considered as constituting a business activity producing ordinary income.
22. The decisions to buy or sell timberland were made by the three parties to the Agreement at short meetings held every 3 or 4 months. In making these decisions, Scott and *453 Grilpin relied primarily upon tbe judgment and experience of McFadon. The time spent by either Scott or Grilpin on Agreement activities was negligible and primarily consisted of attending the aforesaid meetings.
23. Prior to the dispute herein involved arising out of the two 1952 sales under the Agreement, the parties to the Agreement had a similar dispute with the Technical Staff, Northwestern Division, Bureau of Internal Revenue, Treasury Department, with respect to sales made under the Agreement in 1946,1947, and 1948. This dispute was ultimately settled in April 1951. Among the factors emphasized by defendant’s representatives during the course of the dispute and settlement negotiations were (1) the advertising that had taken place in 1947, as set forth in finding 15, and (2) the holding periods of the tracts involved, which defendant’s representatives considered to be short. The holding periods of the tracts sold in 1946, 1947 and 1948 are set forth in finding 8(b). After the dispute arose, no further advertising was done. Further purchases under the Agreement ceased after January 20, 1949 (finding 8'(b)). After the settlement in April 1951, all holdings under the Agreement were liquidated by one sale made in June 1951 (findings 8(a) and (b)) and the two sales in 1952 herein involved, the holding periods of the tracts involved in the two 1952 sales being set forth in finding 8(b) and findings 9 (b) and (c).
24. During the years the Agreement was in effect, Gilpin had many transactions in stocks and bonds. His transactions in 1954, in which he sold 4,765 shares in 26 corporations, and received dividends from the stocks of 21 corporations, were typical. He spent considerably more time on his investments in stocks and bonds than he did on Agreement timberlands. In addition to his primary occupation as a furniture manufacturer, he also devoted considerable time to the business of the Puget Sound National Bank as a director, attending the monthly meetings of the Board, and as a member of the Executive Committee, which met every week.
25. During the years the Agreement was in effect, Scott’s primary occupation was the practice of law. Approximately 80 percent of his time was devoted to his law practice. The *454 balance of bis time was devoted principally to family business affairs and to his investments in stocks. In 1953 and 1954 he received dividends from the stocks of 27 and 22 corporations, respectively.
26.For the two sales in 1952, the total sales price was $454,720 and the total gain was $407,851.97. Scott and Gil-pin (in joint returns with their wives) each reported his distributive share of the gain on the installment basis as follows:
1952_$19, 029. 86
1953_ 34,400.17
1954_ 49,429.50
Additional gain was realized from these two sales in 1955.
27. On their Federal income tax returns, plaintiffs reported their distributive shares of the gain referred to in finding 26 as capital gain. The Commissioner of Internal Revenue assessed deficiencies against Scott for 1953, 1954 and 1955, and against Gilpin for 1954 and 1955, on the theory that the gain was ordinary income.
28. The assessment against Scott for 1953 was satisfied by a payment of $16,022.77 on November 14, 1957. Of this amount $12,518.46 was for tax; $751.11 for a penalty under Section 294- of the Internal Revenue Code, and $2,753.20 for interest.
29. The assessment against Scott for 1954 was satisfied by a payment of $17,924.77 on November 14, 1957. Of this amount $15,520.20 was for tax and $2,404.57 for interest.
30. The assessment against Gilpin for 1954 was satisfied by a payment of $27,983.49 on November 22, 1957. Of this amount $24,203.65 was for tax and $3,779.84 for interest.
31. (a) On January 27,1958, Scott and his wife duly filed a timely claim for the refund of 1953 and 1954 taxes.
(b) On January 27, 1958, Gilpin and his wife filed a timely claim for the refund of 1954 taxes.
32. By registered letter dated January 31, 1958, the Commissioner notified each of the plaintiffs that the claim for refund was disallowed. The date of mailing said letters is less than 2 years prior to the filing of the petitions herein on March 24,1958.
*455 CONCLUSION OF LAW
Upon the foregoing findings of fact, which are made a part of the judgment herein, the court concludes as a matter of law that plaintiffs are entitled to recover, and judgment will be entered to that effect. The amount of recovery will be determined pursuant to Buie 38 (c).
In accordance with the opinion of the court and on a memorandum report of the commissioner as to the amounts due thereunder, it was ordered on August 8,1962, that judgment be entered for plaintiffs Byron D. Scott and Virginia P. Scott in case No. 123-58 for $33,947.54, together with interest thereon as provided by law from November 14,1957. It was further ordered that judgment be entered for plaintiffs Joseph H. Gilpin and Mary on T. Gilpin in case No. 124-58 for $27,983.49, together with interest thereon as provided by law from November 22,1957.

 Tracts Nos. 1, 2, 3, 4, 5, 6, 7, and 8 in red on Deft.’s Ex. 4.

 Tract 9 in red on Deft.’s Ex. 4.

 Tracts 10 and 11 in red on Deft.’s Ex. 4. These were located in Jackson County in the vicinity of the southern part of Douglas County.

 Tracts 2, 3, 4, 5, 6, 7, 9, and 26 in green on Deft.’s Ex. 4.

 Tracts 8,14, 15, and 35 in green on Deft.’s Ex. 4.

 Tract 37 on Deft.’s Exs. 2 and 4.

 Tracts 13, 14, 15, 16, 17, 18, 19, 22, 23, 24, and 25 in red on Deft.’s Ex. 4.

 Tracts 12, 20, and 21 in red on Deft.’s Ex. 4.

 Tracts 10, 12, 16, 17, 18, 20, 22, 25, 27, 81, 33, 47, and 48 in green on Deft.’s Ex. 4.

 Tracts 11, 29, 32, 43, 44, 45, 46, and 49 in green on Deft.’s Ex. 4.

 Tracts 13, 19, and 23 on Deft.’s Ex. 2.